304 So.2d 209

Harbert S. GREGORY

v.

Clifford W. HARDY, Jr. and Jane C. McFerrin, as Executrix of the Estate of J. Carter McFerrin, Deceased.

Civ. 355.

Court of Civil Appeals of Alabama.

Dec. 4, 1974.

George I. Case, Jr., Thomas E. Skinner and Benjamin B. Spratling, III, Birmingham, for appellant.

Clifford W. Hardy, Jr., Bessemer, for appellees.

**BRADLEY, Judge.**

The appeal is from a judgment of the Circuit Court of Jefferson County, Bessemer Division, awarding damages in the amount of $5,000 to appellees. The action was commenced when appellees-plaintiffs filed a five count complaint against appellant-defendant and others seeking recovery for work performed in drafting certain documents to implement an agreement for the financing of an existing business. Appellant asserted among other defenses the statute of frauds. Trial was held before the court sitting without a jury. Judgment was rendered in favor of appellees for $5,000 and from that judgment appeal was perfected to this court. Subsequent to the perfection of the appeal and prior to its submission on briefs and oral argument, one of the appellees, J. Carter McFerrin died. Motion has been made to this court that the cause be revived as to J. Carter McFerrin by the substitution of Jane C. McFerrin, the Executrix of the Estate of J. Carter McFerrin, deceased, as one of the appellees. It is so ordered.

The facts show that appellee-plaintiff, J. Carter McFerrin, a practicing attorney in Birmingham, was representing Connector Products Corporation of Birmingham, Alabama in 1972, mostly on a per diem basis.

On April 19, 1972 the appellant-defendant, Harbert S. Gregory, wrote a letter to William Murphy, president of Connector Products Corporation, Birmingham, Alabama, hereinafter referred to as CPC, confirming prior discussions and agreements had for the purpose of enlisting Mr. Gregory's aid in securing additional working capital for CPC. Mr. Gregory proposed that in exchange for his arranging for a loan for CPC in the amount of $100,000, he was to receive a share of the ownership of CPC.

The letter of April 19, 1972 outlined the measures to be taken by CPC for the purposes of carrying out its end of the bargain. McFerrin in July 1972 employed appellee-plaintiff Hardy to assist in preparing the documents that would be required to implement the April 19, 1972 agreement between Gregory and Murphy on behalf of CPC. McFerrin and Hardy testified that there were many conferences and many

drafts of the various documents that were prepared for implementation of the April 19, 1972 agreement. These plaintiffs testified that the many drafts were necessitated by the request for changes initiated by Gregory personally or through his lawyer.

The meetings, negotiations and changes made in the various documents required of CPC occurred over a period of several months. On January 19, 1973 a meeting was held in Birmingham, Alabama in the office of Mr. Gregory's attorney, Mr. Thomas E. Skinner. Those attending were McFerrin, Hardy, Murphy, Skinner and Gregory. They were informed that the final drafts of the documents had been completed.

At this meeting it was made known that Gregory had obtained contingent ownership of at least fifty percent of the stock of CPC and was assuming the role of chief executive officer. Sometime during the meeting, the statement was made by McFerrin that: "Mr. Tom, we ought to get paid for our work." McFerrin then testified that Mr. Skinner replied: "I agree and you will be paid for your work." McFerrin then stated that Gregory agreed with Skinner that plaintiffs would be paid for their work.

However, Skinner wrote the following letter to McFerrin on January 18, 1973, the day before the January 19, 1973 meeting discussed above:

"January 18, 1973

"Mr. J. Carter McFerrin
Attorney at Law
1522 City Federal Building
Birmingham, Alabama 35203

"Dear Mr. McFerrin:

"This will confirm our agreement, with my representing Mr. H. S. Gregory, that it is permissible for you to represent Mr. William Murphy in connection with the dispute which has arisen between Mr. Murphy and Mr. Gregory.

"It is recognized that you are attorney for Connector Products Corporation, and that there might be a possible conflict. It is for this reason that I am writing this letter authorizing you to represent Mr. Murphy at Mr. Murphy's expense.

"Sincerely,

"Thomas E. Skinner

"TES:ch"

McFerrin also testified that the only agreement he had with Gregory concerning employment or representation was when Gregory took possession on January 19, 1973 of their work product after having assured them of payment.

Hardy testified that during the January 19, 1973 meeting, Gregory become the chief executive officer of CPC with Murphy remaining as president with a guaranteed salary and bonus. Murphy could sign checks but they had to be countersigned by Gregory.

According to Hardy's testimony, during the January 19, 1973 meeting, Skinner, in reply to McFerrin's inquiry about the payment of their fee, said: "We'll see that your fee is paid," and Mr. Gregory stated: "That's right." Hardy also stated that he turned the completed documents over to Mr. Skinner at the end of the January 19, 1973 meeting. He said that no one was present at this time but him and Mr. Skinner, the others having departed.

Mr. Hardy also stated that he submitted a bill about a week after January 19, 1973 to CPC for their services. No payment has been received. On March 10, 1973 Hardy wrote a letter to Mr. Skinner in which he expressed concern about his fee and it is as follows:

"March 10, 1973

"Hon. Thomas E. Skinner
2350 First Nat'l–Southern Natural Bldg.
Birmingham, Alabama

"In re: Fee owed by Connector
Products to Holliman and
Hardy In amount of $5100.00

"Dear Tom:

"From our telephone conversation on Friday I understand that Connector

Products, through Mr. Harbert Gregory, will ask all creditors for a four months moratorium. This of course will be requested of Holliman and Hardy regarding the subject of this letter, i. e. the $5100.00.

"I have become aware of Connector Products' financial problems not only from our conversation, but over the past months and weeks, I have been given repeated promises of 'a check in the mail.' These promises remind me of one thing, the hounds at bay.

"The favor asked our firm I will consent to if Mr. Gregory in turn will grant me a favor—that he sign a demand note personally guaranteeing the payment of the fee. As mentioned in our conversation last Friday and previously mentioned in your office with all principals of Connector Products present, the fee is just, due, reasonable and is not disputed. I should like to hear from you by Wednesday, March 14th.

"Yours truly,

"(signed) Clifford W. Hardy, Jr.

"Clifford W. Hardy, Jr.

"CWHjr/mlh"

Mr. Gregory, according to Hardy, did not sign the note.

Prior to sending the March 10, 1973 letter to Skinner, Hardy did state that he received a communication from Gregory written on behalf of CPC asking for a four month delay in payment of the bill owed to him by CPC.

Mr. Murphy said his recollection of the statements concerning the payment of plaintiffs' fee were that McFerrin mentioned that the documents had been prepared as requested and they wished to be paid. In response Mr. Skinner said: "You'll be paid," and Mr. Gregory nodded.

Mr. Murphy also testified that at the time of the April 1972 meeting he was president of CPC and directed McFerrin to prepare the necessary documents to comply with said agreement between him as chief executive officer of CPC and Gregory. He said the purpose of this agreement was to obtain additional funding for CPC.

Mr. Murphy further stated that the January 22, 1973 statement sent to CPC by plaintiffs seeking payment for their work in the amount of $5,100 was the only statement for payment of their fees that was ever brought to his attention. He said that he never actually saw the statement but knew it was at CPC because he received numerous calls about it from McFerrin and Hardy. He further said that upon receipt by CPC of this statement, he had a CPC check prepared for Gregory's signature to pay the fee, but Gregory would not sign it.

Gregory testified that he did not get the first draft of the instruments called for by the April 1972 agreement from plaintiffs until November 1972. He said that in the meantime, specifically September 1972, he had agreed to underwrite a second loan from CPC from Birmingham Trust National Bank. In exchange for this additional funding, he was to receive fifty percent of the ownership in CPC.

Gregory then testified that he remembers a statement made by McFerrin at the January 19, 1973 meeting to the effect that he had done a lot of work and should be paid; but he said that he did not make any commitment to personally pay the attorney fee of plaintiffs at this meeting or at any other time. Futher, it was his understanding throughout the period during which the various documents were being prepared that CPC and Murphy were to have prepared and furnished to him the necessary documents to fully implement the April 1972 agreement and the supplemental agreement entered into in September 1972.

On March 12, 1973 CPC requested of its creditors a four month moratorium on its debts. Then in April 1973 CPC filed for bankruptcy.

In April 1973 plaintiffs, Hardy and McFerrin, filed the present action against Gregory and Murphy seeking payment of their attorney fee.

Appellant argues, along with other contentions, that the agreement on which plaintiffs, Hardy and McFerrin, are relying for recovery, is violative of the statute of frauds on the gounds that the alleged promise was without consideration and was not in writing.

Appellees deny that there has been a violation of the statute of frauds. They say that there was new consideration for Gregory's promise to be personally liable for their fee. They also say where a creditor releases a lien upon the promise of a third party to pay the debt upon which the lien is founded, the promise is not within the statute of frauds.

Title 20, Section 3, subsection 3, Code of Alabama 1940, as Recompiled 1958, is as follows:

"In the following cases, every agreement is void, unless such agreement, or some note or memorandum thereof, expressing the consideration, is in writing, and subscribed by the party to be charged therewith, or some other person by him thereunto lawfully authorized in writing:

.    .    .    .    .    .

"(3) Every special promise to answer for the debt, default, or miscarriage of another."

The effect of the statute is that any promise to pay the debt of another must be in writing. 35 A.L.R.2d, Section 1, p. 908. The courts have developed a method of classifying such promises by categorizing them either as "original" or as "collateral." If a promise is "original," it is said to be without the statute and, if "collateral," to be within the statute. Various tests have been devised by the courts to aid them in making this determination.

One of the accepted tests of whether the promise is collateral is found in American Casualty Co. of Reading, Pa. v. Devine, 275 Ala. 628, 157 So.2d 661, wherein the supreme court said:

".   .   . if the transaction be such that the third person is responsible to the person who supplies the articles, the promise of the defendant is collateral, and, if oral, not binding, [citations omitted]."

The case of Puckett v. Bates, 4 Ala. 390, was cited in Schiffman v. H. L. Raburn & Co., 47 Ala.App. 390, 255 So.2d 332, for the statement:

"The law is certainly well established that if the person for whose debt, default or miscarriage the undertaking is made, be liable at all so that the whole responsibility does not rest upon the second promissor, the second promise is collateral, and is void by the statute if not reduced to writing.   .   .   ."

In the case at bar, the conclusion is inescapable that McFerrin who later employed Hardy to assist him was employed by CPC and Murphy to represent originally the interests of CPC in obtaining additional working capital. Subsequently the plaintiffs were also employed to represent Murphy individually.

Furthermore, the plaintiffs never ceased to look to CPC for the payment of their fee even after the alleged promise of Gregory assuring them that they would receive their fee.   the evidence shows without contradiction that the bill for the legal services was presented to CPC for payment several weeks after the alleged agreement with Gregory that he would assure payment. January 18, 1973, the day before the alleged promise was made, Skinner wrote McFerrin, stating as a confirmation of a prior agreement, that he was representing Greogry and even though McFerrin was recognized as the attorney for CPC, it was permissible for him to represent Murphy at Murphy's expense.

The principle enunciated by the cited cases is to the effect that if CPC be liable at all for the payment of the legal fees of plaintiffs, then the alleged promise of Gregory to be responsible also for the fees is collateral and, if not in writing, within the statute of frauds.

The evidence overwhelmingly establishes that CPC was liable for plaintiffs' fees and that plaintiffs themselves so considered even after the alleged promise by Gregory. Further, it is without question that Gregory's alleged promise of January 19, 1973 was oral and not in writing; consequently, such a promise is collateral, within the statute of frauds, and hence not binding on Gregory.

As to the issue of lack of consideration for the alleged promise, appellant says that he received no benefit for his promise to pay the debt of CPC and Murphy. He pointed out that the documents and papers were prepared by plaintiffs on behalf of CPC so that it could carry out its end of the April 19, 1972 agreement. That agreement required that certain stock changes be made along with changes in the charter and by-laws of CPC to reflect his connection therewith in exchange for his action in obtaining funds for CPC's benefit. In other words, whatever plaintiffs did in the way of implementing the April agreement was due him by virtue of that agreement. Consequently the turning over to him of these papers did not amount to an additional benefit. He was already entitled to them and CPC was obligated to furnish them.

Appellant also says that the delivery of plaintiffs' work product did not amount to new consideration for that the work had already been performed. It is undisputed that the work was complete at the time of delivery on January 19, 1973.

■ Appellant says that past consideration is insufficient and cites 17 C.J.S. Contracts § 116, p. 838:

"A past consideration is insufficient, even though of benefit to the promisor, where the services rendered or things of value furnished are intended and expected to be gratuitous, and a past consideration is not sufficient to support a contract, particularly where the benefit derived, if any, was enjoyed by a third person rather than by the promisor."

Supportive of this principle is Kelley v. Spencer, 213 Ala. 612, 105 So. 802. There is no question but that the work was complete at the time the promise was allegedly made, hence the debt in question was already in existence.

■ Where the debt has already been incurred, unless there is other consideration or forbearance, the promise to the creditor to pay the debt of a third person is not enforceable. Flintkote Co. v. Grimes, 281 Ala. 707, 208 So.2d 87; Haase v. Cardoza, 165 Cal.App.2d 35, 331 P.2d 419; Luing v. Peterson, 143 Minn. 6, 172 N.W. 692; 1 Corbin on Contracts, Section 114, p. 500.

Appellees answer by saying that when they delivered their work product to Gregory and he promised to pay for it, the lien against CPC for their work ceased to exist and the appellant then owned the debt, work product and right to sue CPC for the amount of the fee. This, according to appellees, amounted to new and different consideration, taking the promise out of the statute of frauds.

Appellant's reply to this is that: (1) there is no evidence to support appellees' contention that they gave up an attorney's lien in consideration for his promise to pay their fee; and (2) if there had been a relinquishment of an attorney's lien on January 19, 1973, in order for it to be consideration for his promise to pay their fee, it is essential that the relinquishment was made in exchange for the assurance of payment.

■ In 1 Corbin on Contracts, Section 116, p. 504, the following is found:

"The American Law Institute has seen fit to define consideration as anything that is bargained for by the promisor and

given by the promisee in exchange for the promise, and as nothing else. . . ."

Supportive of Corbin's statement is this excerpt from 17 C.J.S. Contracts § 98, p. 784:

". . . [P]romises must be concurrent, that is, they must become obligatory at the same time; otherwise each is a nudum pactum at the time it is made, and neither will support the other. Promises made at different times on the same day are not sufficient."

Also see Kimbro v. Wells, 112 Ark. 126, 165 S.W. 645.

■ As to appellant's first contention that there is no evidence of a relinquishment by appellees of their attorneys' lien, we agree. As appellant said in brief: "There is absolutely no evidence of anyone mentioning at anytime that appellee[s] had or [were] relinquishing an attorney's lien." There was no discussion or mention at the time of the alleged assurance of payment that the documents would be delivered or even that they would not be delivered in the absence of payment or the assurance of payment.

Secondly, as we perceive from Corbin on Contracts and C.J.S., there can be no consideration for a relinquishment unless the relinquishment was made in exchange for a promise. The two must occur at the same time; otherwise they will not support each other. The evidence preponderates in favor of the conclusion that the transfer of the documents occurred sometime after Gregory's alleged promise.

Based on the above, we are of the opinion that there was no new or independent consideration given in exchange for Gregory's alleged promise to pay appellees' attorneys' fee; hence the purported promise made by Gregory was not taken out of the statute of frauds as argued by appellees.

For the reasons stated, the trial court erred in rendering a judgment against Gregory; therefore the judgment as to Gregory must be reversed. The judgment of the trial court as to Gregory is reversed and the cause remanded for the entry of a judgment in accordance with this opinion.

Motion to revive granted; reversed and remanded with directions.

WRIGHT, P. J., and HOLMES, J., concur.