Mike **MERCER,** d/b/a Food Projects Consultants, a sole proprietorship with its principal place of business in the United Kingdom, Plaintiff–Counterclaim defendant-Appellee,

v.

DAVIS & BERRYMAN INTERNATIONAL, INC., a corporation incorporated under the laws of the State of Alabama, and Roy Davis, Defendants–Counterclaim plaintiffs-Appellants.

No. 86–7851.

United States Court of Appeals,
Eleventh Circuit.

Dec. 21, 1987.

---

Eddie Beason, Fine & Associates, Russellville, Ala., for defendants-counterclaim defendant-appellee.

Dennis G. Pantazis, Gordon, Silberman, Wiggins & Childs, P.C., Birmingham, Ala., for plaintiff-counterclaim defendant-appellee.

Before JOHNSON and CLARK, Circuit Judges, and EATON [*], Senior District Judge.

CLARK, Circuit Judge:

This appeal results from judgments against Davis & Berryman International, Inc. ("D & B") and Roy Davis, D & B's president, in a diversity action brought by Mike Mercer, a British citizen, doing business as Food Projects Consultants ("FPC"). A jury initially awarded Mercer $160,000 plus interest on his breach of contract claim against D & B, and a total of $216,333—$75,000 in compensatory damages and $141,333 in punitive damages—on his fraud claim against Davis. The district court, however, deemed the punitive damages award excessive, and conditioned its grant of a new trial on Mercer's acceptance of a reduced punitive damages award of $25,000. Mercer rejected the remittitur and on retrial of the punitive damages issue, the jury awarded him $75,000. The appellants raise objections to various rulings at both trials. We affirm the judgments in every respect but the $75,000 compensatory damage award for Davis' fraud.

Mercer's business, FPC, is essentially a consulting firm hired to help foreign organizations develop major food projects. Record, Vol. 2 at 79. In early 1982, Mercer began work on two such projects, both in Nigeria, one involving a Dr. Dapo Tejuoso and the other a Chief Olushola Afolabi. Both Tejuoso and Afolabi were interested in expanding and modernizing their poultry farms, and Mercer presented them with feasibility studies suggesting for each a three-stage plan of expansion. *Id.* at 88–90. Soon thereafter, Mercer entered into consultancy agreements with Tejuoso and Afolabi, each agreement providing for a $175,000 consulting fee. *Id.* at 89, 91.

The first stage of each project was to be the erection of several poultry houses and the installation of certain equipment. FPC

---

[*] Honorable Joe Eaton, Senior U.S. District Judge for the Southern District of Florida, sitting by designation.

was responsible for selecting the suppliers of the houses and equipment. Plaintiff's Exh. 2, at 3, 11. In connection with this responsibility, Mercer began discussions with Roy Davis to see if Davis' company, at that time called Strickland & Davis ("S & D"), would be interested in supplying the projects. In the course of those negotiations, Mercer testified, he and Davis went over the costs of the projects and Mercer gave Davis a cost "breakdown" that reflected FPC's $175,000 fee. Record, Vol. 2 at 94–95. According to Mercer, it was clear to both parties and, for that matter, Tejuoso, that the bulk of the consulting fees would have to come from loans Davis would arrange in the United States to finance the project. *Id.* at 95–96. Davis ultimately agreed to take the projects on. *Id.* at 91.

On October 28, 1982, apparently to confirm S & D's participation in the projects and his own fee arrangement, Mercer sent Davis a telex including the following paragraph.

4. If we arrange for down payment of 270,000 USD to First National Bank, we must ask for your confirmation by return telex, for our bankers, that 175,000 USD per contract will be cable transferred by S and D to:

National Westminster Bank PLC
St. Johns Road Branch
Tunbridge Wells, Kent, England

For the account of Food Projects Consultants. This to cover initial commission agreed to be paid in UK on completion of documentation and deposit receipt, plus portion of consultancy fees agreed with client to be funded from first loan—We can then sort out rest after shipment.

I must show client this telex prior to effecting all documentation.

Record, Vol. 2 at 96, 98–99; Plaintiff's Exh. 3. Mercer testified that his use of the term "documentation" referred to the contracts between S & D and Tejuoso and Afolabi; Davis testified that the term included promissory notes from the Nigerians. Davis responded by telex the same day. His fourth paragraph read as follows.

4. We hereby confirm that upon receipt of downpayment(s) of 270,000 U.S. dollars as received from each poultry project as contract agreement for Nigerian projects. S + D International will, transfer by cable the sum of 175,000 U.S. dollars (for consultant fee's [sic]) to the account of:

Food Projects Consultants
National Westminster Bank PLC
St. Johns Road Branch
Tunbridge Wells, Kent, England

It is understood that S + D Intl will receive invoice statement from Food Project Consultants for above amount.

Record, Vol. 2 at 97, 104; Plaintiff's Exh. 4. On October 29, 1982, FPC sent S & D two invoices for the fees. Record, Vol. 2 at 108–09; Plaintiff's Exhs. 5, 6.

On January 19, 1983, Afolabi executed a contract with S & D, and in September of 1983, the firm received Afolabi's $270,000 down payment. Record, Vol. 2 at 116, 121. From October, 1983 until January, 1984, in four installments, S & D paid Mercer $175,000. *Id.* at 121. (During this time S & D became D & B. *Id.* at 126; Plaintiff's Exh. 9.) The Tejuoso deal took somewhat longer to get started. Although Tejuoso signed the contract on November 28, 1982, D & B did not receive the down payment until January of 1984. Record, Vol. 2 at 113, 123.

Mercer and Davis met that same month, January 1984, in Davis' Russellville, Alabama offices. Mercer testified that because D & B had not yet paid FPC's fees on the Tejuoso project, he asked Davis for a letter of credit payable to FPC. According to Mercer, Davis seemed to accept this but suggested that $75,000 that he would pay Mercer immediately be left off the letter. *Id.* at 131–32. Davis did not, however, pay the $75,000 right away; he instead told Mercer that if he would meet him in Nigeria to work out some details, he would be paid there. *Id.* at 132–33.

Soon thereafter, Mercer and Davis traveled to Nigeria. On February 8, the day Davis was returning to the United States, Davis gave Mercer a $75,000 check made out to Food Projects Consultants. *Id.* at

133, 135. The check was admitted into evidence, *see* Plaintiff's Exh. 11, but the parties disagreed sharply about the events surrounding its exchange. According to Mercer, the check was dated February 8 and Davis put no conditions on it other than to ask that it not be cashed until the end of the month. Record, Vol. 2 at 133–34. Mercer deposited the check on February 29, but on March 1, Davis sent Mercer a telex indicating that he had stopped payment on the check. Defendant's Exh. 6.

According to Davis, the check was postdated February 18 (the 1 had been rubbed off, he testified) and Mercer had asked him for it simply to have credibility in telling Tejuoso that foreign exchange was available. Tejuoso had still not signed the promissory note needed to obtain financing, Davis said, and Mercer thought he might use the check for leverage to get Tejuoso's signature. Record, Vol. 2 at 267–69. Davis also testified at trial that he would have let Mercer keep the check had the promissory note been signed. *Id.* at 269. In his pretrial deposition, however, Davis had said that he intended to stop payment on it "no matter what happened." *Id.* at 271–72.

In any event, Davis never offered a replacement check and FPC was paid nothing further until June 1984. *Id.* at 130. At that time, according to Mercer, Tejuoso learned that FPC had not been paid and isntructed Davis to wire Mercer $15,000, which Davis did, reducing the amount owed FPC to $160,000. *Id.* at 145. Davis testified that he wired the money strictly for Tejuoso's use and denied that it was a payment on any contract. *Id.* at 285.

On December 26, 1984, after receiving no further payment, Mercer filed suit seeking damages from D & B for breach of the contract formed by the telexes and from Roy Davis individually for his allegedly

fraudulent tender of the $75,000 check. D & B answered that either there was no contract or if there was, one of its terms was the delivery of the promissory notes on both contracts. Davis argued that the check had never been intended as a payment to Mercer. After a trial at which only Mercer and Davis testified, the jury returned verdicts against both appellants, and the district court denied motions by both for directed verdicts and judgments notwithstanding the verdicts. Davis' motion for new trial was granted only with respect to punitive damages and only after Mercer refused to remit $116,333 of his $141,333 punitive damages award. On the retrial of the punitive damages issues, Mercer was awarded $75,000.

## I. *Sufficiency of the Evidence*

Appellants both contend that the district court erred by not granting them judgments as a matter of law. On reviewing whether a motion for directed verdict or judgment notwithstanding the verdict should have been granted, we must both examine the evidence in the light and draw all reasonable inferences most favorable to the party opposing the motion. *Boeing Co. v. Shipman*, 411 F.2d 365, 374–75 (5th Cir. 1969) (en banc). Having done so, we find that appellants' contentions border on the frivolous.

## A. *The Breach of Contract Claim*

Although D & B chose to insist that there could not be a separate contract between D & B and Mercer because Mercer was at all times Tejuoso's agent, there is no legal principle per se precluding overlapping contracts, and that is apparently precisely what the jury found.[1] It is true that, under Alabama law, consideration will not be found from something the promisee

---

1. D & B's failure to recognize this accounts for several of the district court's rulings of which D & B complains: the directed verdict for Mercer on D & B's "affirmative defense" of "payment"; the exclusion of evidence and testimony concerning payments to Tejuoso; and the court's failure to charge on pre-existing duty and the function of an agent. We agree with the district court's rulings on all of these matters. Mercer's

contract with Tejuoso simply did not, as D & B seems to insist, prevent him from contracting with Davis, and thus the Mercer–Davis contract (or the lack thereof) was the only one at issue. To have permitted evidence, testimony and jury charges concerning agency and payments to Tejuoso would have confused the jury and served no relevant purpose.

was already legally bound to do. *See Little v. Redditt,* 264 Ala. 371, 88 So.2d 354, 357 (1956); *Gregory v. Hardy,* 53 Ala.App. 705, 304 So.2d 209, 214 (1974). That principle, however, has no application here, for as Mercer has contended all along, he was bound by his contract with Tejuoso only to select *some* contractor, not to select D & B. Indeed, Mercer's discussion of the fee arrangement in the initial negotiation sessions suggests that he probably would not have selected Davis' firm had Davis not agreed to the fee arrangement. Mercer's selection of D & B could thus have constituted new and valuable consideration; it clearly qualified as an "act of the plaintiff from which the defendant derived a pecuniary benefit." *Files v. Schaible,* 445 So.2d 257, 260 (Ala.1984); *see also Hodge v. Joy,* 207 Ala. 198, 92 So. 171, 176 (1922) (adequate consideration presumed where contract is in writing).

■ D & B also argues that the evidence was insufficient to establish the "meeting of the minds" required for a valid contract. Given the explicit language of the telexes, we simply do not agree. Although mere offer and acceptance language is not of itself conclusive in proving a contract, *see City of Montgomery v. Maull,* 344 So.2d 492, 494 (Ala.1977), an unambiguous written agreement will be enforced where the parties' intent can be gleaned from the documents themselves or from the parties' conduct. *Schmidt v. Ladner Construction Co.,* 370 So.2d 970, 972 (Ala.1979); *Mayo v. Andress,* 373 So.2d 620, 624 (Ala. 1979). Davis' October 28 return telex verifies that the $175,000 was for consulting fees (not for foreign exchange for the client, as he testified). Furthermore, Davis paid Mercer's fees for the Afolabi project, and his explanation of how that situation differed—he had heard that Mercer had obtained the promissory notes—goes only to a particular term and in fact belies his claim that there was no contract. The in-

tent of the parties was not in doubt from the telexes, and the court was entirely correct to deny D & B's motions for directed verdict and judgment notwithstanding the verdict.

■ D & B's final argument with respect to Mercer's contract claim is that if indeed there was a contract, D & B was still entitled to judgment as a matter of law because there was no dispute that Mercer never obtained a signed promissory note from Tejuoso and thus himself breached the contract's terms. Again, D & B's argument is only half correct. Although it is true that Mercer admitted he had never turned over a promissory note to D & B, Mercer also insisted throughout his testimony that it was not his responsibility to D & B to do so. Hence, there was a conflict in the evidence over the contract terms, and D & B was not entitled to judgment as a matter of law.

### B. *The Fraud Claim*

■ The district court was also correct in denying Roy Davis' motions for directed verdict and judgment notwithstanding the verdict. In order to prove his case of fraud, Mercer needed to show (1) that by giving Mercer the $75,000 check,[2] Davis promised to pay him without any intent to do so and with an intent to deceive; (2) that he justifiably relied on that promise; and (3) that he was damaged thereby. *See Marshall Durbin Farms, Inc. v. Landers,* 470 So.2d 1098, 1101 (Ala.1985); *Kennedy Electric Co. v. Moore-Handley, Inc.,* 437 So.2d 76, 80 (Ala.1983); Ala.Code § 6-5-104(a), (b)(4) (1977). Davis quarrels with Mercer's showing on all three elements, but the evidence was sufficient in every respect.

■ Davis' mere failure to honor the check he gave Mercer, had it stood alone, would not have been sufficient to prove his intent not to honor it at the time it was

---

**2.** We note that there is some confusion with the fraud claim. Appellee argues in his brief that it was based on Davis' promise in *Alabama,* and, indeed, there was proof at trial supporting such a theory. The district court, however, appears to have proceeded on the theory that the ex-

change of the check in *Nigeria* was the basis for the claim. Because the latter is the theory of the complaint, the amended complaint, the pretrial order and the charge to the jury, we consider the fraud as based only on the check, not the earlier promise.

given. *See Russellville Production Credit Ass'n v. Frost*, 484 So.2d 1084, 1086 (Ala. 1986). However, a combination of failure to perform and other circumstances evidencing ill intent may suffice. *See Brock v. Brock*, 90 Ala. 86, 8 So. 11, 13 (1890); *Bracewell v. Bryan*, 57 Ala.App. 494, 329 So.2d 552, 555 (1976). Those additional circumstances were present here. There was testimony that Davis asked Mercer to hold the check until the end of February, coincidentally after Mercer's work in Nigeria would be done, and that he notified Mercer on March 1 that payment had been stopped. Moreover, Davis testified at his deposition that he never intended to honor the check. At trial, he said he would have honored it had Mercer gotten the promissory notes. Thus, even if Davis' deposition testimony is considered only for impeachment purposes, Davis' waffling on precisely what his intent was constitutes evidence that it might have been anything but honoring the check. *See, e.g., id.*, 329 So.2d at 555 (defendant liable where he initially promised 6% commission, later said commission rate would vary, and at trial denied any commission whatever was owed).

The evidence establishing justifiable reliance and damage was also sufficient to reach the jury. Mercer testified that he remained in Nigeria working on the project and refrained from taking any other action to obtain his fees in the belief that the check was good. This testimony alone was sufficient to establish Mercer's reliance on the promise, and although it left the *amount* of damages in question, as we will discuss later, it also established that Davis' promise caused Mercer to incur expenses he otherwise would not have.

## II. *Appellee's Closing Argument*

 Appellants' second objection concerns the closing argument of Mercer's counsel. While explaining Mercer's reasons for seeking punitive damages, counsel made the following remark: "the reason [this deal was] not put together is because Roy Davis never intended to live by his agreement. He got over one million dollars." Record, Vol. 2 at 411. Appellants' counsel objected immediately but was over-

ruled. Appellants now contend, on the basis of *Warren v. Ford Motor Credit Co.*, 693 F.2d 1373, 1378 (11th Cir.1982), that Mercer's counsel was improperly arguing Roy Davis' wealth. *See also Southern Life & Health Insurance Co. v. Whitman*, 358 So.2d 1025, 1027 (Ala.1978).

We are persuaded by Mercer's argument that counsel was speaking only of the money Davis made as a result of the transaction in controversy. Davis testified twice, once on cross-examination and once on examination by the court, as to how much he had made on the Tejuoso project. Appellants' counsel interposed no objection at that time. Moreover, Mercer was seeking punitive damages in the case, and to obtain them counsel had to prove that Davis' fraud was gross, malicious or oppressive. *See General Sales Co. v. Miller*, 454 So.2d 532, 534 (Ala.1984). His apparent purpose in repeating Davis' profit was to contrast the amount Davis made with the amount he allegedly refused to pay Mercer. In view of this relevance of the figure and the fact that no objection was raised initially, the district court did not abuse its discretion in permitting the remark.

## III. *The Motions for New Trial*

 We turn now to appellants' objections to the court's initial failure to grant a new trial on their liability and the compensatory damages and the court's failure after the second trial to grant a new trial on the punitive damages. We find no abuse of discretion whatsoever with respect to appellants' liability and the award of damages for D & B's breach of contract. Because only two witnesses, the opposing parties, testified at trial, the case became a credibility contest. Quite clearly, the district court and the jury believed Mercer, and we cannot say that the weight of the evidence was against their conclusion. Roy Davis was impeached with his statements in deposition, and some of his testimony appears from the record remarkable at best.

 With respect to the award of damages, however, there are two problems.

First, it appears that the jury awarded Mercer $75,000 because that was the amount of the check Davis fraudulently tendered toward Mercer's fees. Although we understand that, as counsel maintained at oral argument, the suits against Davis and D & B were two different causes of action warranting different measures of damages, we believe nonetheless that the $75,000 constitutes a double recovery prohibited by Alabama law. *See McLendon v. City of Boaz*, 395 So.2d 21, 26 (Ala.1981); C. Gamble & D. Corley, *Alabama Law of Damages* § 1–8, at 9–10 (1982). Had the wrong never occurred, i.e., had Davis never given Mercer the check, Mercer would still have been able to collect all his fees. Indeed, he has recovered the entire amount due him in his contract action here.

■ Second, although Mercer testified that he incurred expenses in Nigeria while working on the project after Davis gave him the check, he failed to carry his burden of proof with respect to the *amount* of those expenses. *See Foodtown Stores, Inc. v. Patterson*, 282 Ala. 477, 213 So.2d 211, 217 (1968); *Smith v. Richardson*, 277 Ala. 389, 171 So.2d 96, 99 (1965). It was not until the second trial that there was any testimony concerning the costs of lodging and board in Nigeria. Mercer was, however, entitled to nominal damages. The Alabama courts have held that in the absence of proof of an exact dollars and cents amount, nominal damages may be awarded if there is evidence of actual damage. *See Maring–Crawford Motor Co. v. Smith*, 285 Ala. 477, 233 So.2d 484, 491 (1970); *Shafer v. Timmons*, 51 Ala.App. 157, 283 So.2d 609, 611 (1973). As discussed earlier, there was evidence from which actual damage could be inferred. Mercer incurred expenses in Nigeria while working on the project and he refrained from taking legal action to collect his fees on the belief that the check was good. For these reasons, we reverse the award of $75,000 in compensatory damages and remand to the district court for the entry of nominal damages. A trial should not be necessary.

■ The $75,000 punitive damages award will stand. Punitive damages are recoverable provided some actual damage is shown, *National States Insurance Co. v. Jones*, 393 So.2d 1361, 1368 (Ala.1980), and these are not so great as to "shock the judicial conscience" or be deemed the product of "sympathy, passion, or prejudice." *Village Toyota Co. v. Stewart*, 433 So.2d 1150, 1155 (Ala.1983) (citing *U–Haul Co. of Alabama v. Long*, 382 So.2d 545 (Ala. 1980)). Furthermore, contrary to Davis' assertion, it is not necessary that they bear any particular relation to the actual damages. *See Surrency v. Harbison*, 489 So. 2d 1097, 1105 (Ala.1986); *see also Johnson Publishing Co. v. Davis*, 271 Ala. 474, 124 So.2d 441, 453 (1960) (punitive damages may be greatly in excess of actual damages).

Davis' two remaining assignments of error are without merit. The district court's exclusion of Tom Anderson–Slight's testimony was well within its discretion to avoid relitigating issues settled by the first trial, and the court's charge that Davis had already been found with intent to injure and deceive was correct due to the type of fraud involved. *See Shiloh Construction Co. v. Mercury Construction Corp.*, 392 So.2d 809, 814 (Ala.1980); *Bracewell*, 57 Ala.App. at 494; 329 So.2d at 555.

We reverse the compensatory damage award against Davis, remand for the entry of nominal damages, and affirm the judgments in every other respect.

AFFIRMED in part, REVERSED and REMANDED in part.