511 So.2d 886 (1987)
JIM MURPHY & ASSOCIATES, INC.
v.
Connie LeBLEU, Coatings Manufacturers, Inc., and Coatings of Mississippi, Inc.
No. 56231.
Supreme Court of Mississippi.
July 8, 1987.
Rehearing Denied September 16, 1987.
*887 A. Spencer Gilbert, III, Wise, Carter, Child & Caraway, Barry H. Powell, Thomas, Price, Alston, Jones & Davis, Jackson, for appellant.
William R. Purdy, William A. Weinischke, Ott & Purdy, Jackson, for appellees.
Before WALKER, C.J., and ROBERTSON and ANDERSON, JJ.
ROBERTSON, Justice, for the Court:

I.
In yet another context the Grand Gulf Nuclear Power Plant has spawned litigation. Today's case arises out of a lucrative painting and coating contract. A contracting and consulting firm was and has remained an effective tout on behalf of the successful bidder and its successors. The tout claims he has not been paid the agreed commission and has brought suit. The lower court held for the painting contractor and dismissed the suit.
We hold that there was and is a valid subsisting and ongoing contractual relationship between the tout and the contractor and that the tout has been paid far less than the agreed upon fee. We reverse, render and remand.

II.

A.
Jim Murphy & Associates, Inc. is a Mississippi corporation with its principal place of business in Jackson, Mississippi. Murphy was the Plaintiff below and is the Appellant here. Murphy's principal and chief executive officer is James L. Murphy, president. Murphy was a consulting and marketing firm, primarily representing a range of different types of contractors in securing and maintaining industrial contracts.
There are three Defendant-Appellees. These are Connie LeBleu, a resident of Natchitoches, Louisiana, who has been sued individually. Two other corporate Defendants are Coatings Manufacturers, Inc., a Louisiana corporation based in Natchitoches, Louisiana, and Coatings of Mississippi, Inc., a Mississippi corporation based in Jackson. The original corporate name of Coatings of Mississippi, Inc. was "Delta-CMI, Inc." LeBleu is a dominant actor within the two corporations, both of which are in the painting business.
Another player is Delta Painters, Inc., an industrial painting concern based in Hattiesburg, Mississippi. John R. Jeter is the president and chief executive officer of Delta. Delta and Jeter are not formal parties to this action.
At some time in 1979 Delta Painters decided to seek the painting and maintenance contract at the Grand Gulf Nuclear Station in Claiborne County, Mississippi. Grand Gulf was owned by Middle South Energy. Mississippi Power & Light Company (MP & L) was agent for Middle South handling the Grand Gulf contract. Murphy has previously worked for MP & L. Delta engaged Murphy's services to assist Delta in securing the contract.
Murphy's fee agreement with Delta was contingent upon Delta's obtaining the contract. *888 If Delta proved the successful bidder, Murphy would receive a flat fee of $500.00 a week or $2,000.00 per month for the duration of the contract, beginning at the time when the painting work built up to the point where Delta had twenty workers on the job. Middle South and MP & L were offering the contract on a cost plus basis, and Delta's arrangement with Murphy, assuming Delta got the contract, was to pay Murphy as MP & L paid Delta. Under its agreement with Delta, Murphy was required that to represent Delta in obtaining the contract and thereafter continue as Delta's representative in maintaining the contract. This was of some consequence because the contract had a sixty day termination clause and numerous other painting contractors were attempting to edge Delta out and obtain the work for themselves.
In early 1981 MP & L notified Delta of its tentative selection as the painting contractor. Shortly thereafter, Delta began experiencing financial problems. Enter CMI and Connie LeBleu. On June 27, 1981, LeBleu and Jeter first met regarding Delta's financial problems and the Grand Gulf painting contract. By July 6 formal award of the contract to Delta Painters was in considerable jeopardy because of Delta's financial problems. This led to the formation of a joint venture between Delta Painters, Inc. and Coatings Manufacturers, Inc. which was evidenced by a written agreement dated July 13, 1981. The agreement recites that the two corporations wished to pool their resources "to contract for certain industrial type coatings contracts and to share the revenues and expenses thereof," although insofar as the record reflects, the joint venture was never interested in any contract other than Grand Gulf. Under the agreement Delta was to have production responsibilities associated with joint venture's jobs, while CMI was to have administrative responsibilities including receipt and disbursement of funds.
After the formation of the joint venture, but prior to the execution of the contract with MP & L, Murphy per James L. Murphy and Delta Painters per John R. Jeter, agreed that Murphy's fee arrangement would remain the same, with the joint venture assuming Delta's obligations. It is not clear whether Connie LeBleu or CMI knew of or agreed to this arrangement. Murphy and Jeter both insisted that they discussed the matter with her, informed her of the agreement, and that she agreed to it. LeBleu denied any such knowledge or agreement.
In any event, on July 31, 1981, the joint venture, as contractor, formally executed the Grand Gulf painting contract with Middle South Energy. Work began on September 17, 1981. By the end of March, 1982, the painting job had built up to twenty workers.
On March 30, 1982, Murphy received its first check from the joint venture in payment of his consultant's fee. The amount of the check was $250.00 Over the next twenty-one months, ending January 4, 1984, the joint venture paid Murphy approximately $34,450.00. All checks were issued by CMI per the joint venture agreement. The checks were signed ultimately by Connie LeBleu, Michael LeBleu, Joe LeBleu, William M. Black, Jerry Beal and other CMI officials.
In April of 1982, Murphy approached CMI, and specifically Connie LeBleu, and proposed a written consulting contract. This action appears to have been prompted by a federal indictment returned against John Jeter, Delta Painters' principal, on charges of receiving stolen goods. This caused Murphy to become nervous about his fee arrangement with the joint venture. Murphy was aware that Delta had been on shaky financial ground. He was further aware that his checks were coming from CMI's office in Nachitoches, Louisiana. Murphy feared that Delta and Jeter would drop out of the picture, leaving him dependent upon CMI and LeBleu.
On April 14, 1982, Jim Murphy & Associates, Inc., as consultant, and Connie LeBleu, individually, and her corporations, as contractors entered into a formal written Consultant Agreement. The Agreement recited, inter alia, that Murphy "has performed services for contractor" and that *889 Murphy "intends to perform further services." The agreement further recited the joint venture agreement between CMI and Delta Painters and then embraced the joint venture's contract with Middle South Energy, Inc. dated July 31, 1981, for the performance of certain painting work at the Grand Gulf Nuclear Station "which contract was procured through the expertise and services of consultant [Murphy]." Looking to the future, the contract recited that CMI and LeBleu desired the benefit of Murphy's "further services and advice throughout the tenure of" the Grand Gulf Nuclear painting contract.
As considerations, the contract provided that LeBleu and her corporations would pay Murphy $1,000.00 upon the execution of the contract, $1,000.00 on May 15, 1982, and $2,000.00 per month beginning June 15, 1982, and $2,000.00 on the 15th day of each month thereafter so long as CMI or LeBleu and any related corporation or concern "is performing a painting or coating contract ... at the Grand Gulf Nuclear Station."
Prior to execution of the Consultant Agreement, the joint venture per CMI had paid to Murphy the sum of $1,000.00 on four separate checks of $250.00 each, the first dated March 30, 1982, the second dated April 7, 1982, and the other two dated April 13, 1982. For the period July 1982 through December 1983  some 18 months  CMI's average monthly receipts from Middle South/MP & L by virtue of the Grand Gulf painting contract were $197,620.75. As of September 1984, and the time of trial, CMI was still the holder of and carrying on work under the painting and coatings maintenance contract at Grand Gulf.
For the period March 30, 1982, through February 25, 1983, the joint venture paid Murphy at the rate of $250.00 per week.
In January of 1983  some 18 months following the joint venture's original execution of the Grand Gulf painting contract, and some nine months after the Murphy-CMI Consultant Agreement  CMI bought out Delta Painters' interest, dissolved the joint venture, and took over the Grand Gulf painting contract in its entirety. A formal dissolution agreement was executed January 26, 1983, wherein Middle South Energy accepted CMI as the sole painting contractor thereafter. CMI expressly assumed all of Delta Painters' obligations to Middle South and MP & L. The dissolution agreement is silent with respect to Murphy.
Thereafter, the painting contract on the Grand Gulf project continued with CMI as the sole contractor. Between March 4, 1983, and November 10, 1983, CMI paid Murphy at the rate of $500.00 per week. This was approximately the $2,000.00 per month consultant fee called for by the Consultant Agreement between CMI and Murphy dated April 14, 1982.
Beginning with a check dated November 16, 1983, CMI reduced the sums paid Murphy to $250.00 per week. This continued through January 4, 1984. In early January of 1984, CMI declared the Murphy contract at an end.
Just what Murphy did following execution of the Consultant Agreement with LeBleu and her two corporations is a matter of considerable dispute. Murphy maintains that he continued to service the Grand Gulf painting and maintenance contract. James L. Murphy testified that he went to the jobsite and visited with the painting superintendent, that he fielded problems with regard to the contract, that he monitored attempts by competitors to hire away Delta/CMI workers. At one point there was an overpayment by MP & L to the joint venture. Murphy says he was the person who went to the MP & L officials and represented the joint venture in working out a pay-back agreement. In connection with the dissolution of the joint venture and Delta Painters' assignment of its interest in the contract to CMI, Murphy stated that he was the principal party active in securing MP & L's approval, and on an expedited basis in the context of a feared Internal Revenue Service move against Delta Painters. In a nutshell, Murphy says that his job was to keep the Grand Gulf painting contract  with its sixty day termination clause  viable and that *890 the best evidence that he did his job is that the contract remained in effect.
CMI's version is quite different. In the first place, Connie LeBleu testified that she signed the Consultant Agreement under duress, i.e., under threat of loss of the Grand Gulf contract which would have meant financial disaster to her and her companies. Thereafter she stated that she advised Murphy that she would pay it $250.00 per week instead of the $2,000.00 per month provided in the agreement. Because CMI was running out of work, LeBleu says she agreed to pay Murphy $500.00 per week if he would help CMI get new business. She claims that Murphy did not secure any new business for CMI nor did he attempt to do so. During 1983 LeBleu states that she became dissatisfied with Murphy's services and that in 1983 she reduced weekly payments to Murphy from $500.00 to $250.00. She cites two reasons for this reduction. First, she had not been able to locate James L. Murphy for months. Second, in her view he was not making any effort to obtain new business for CMI. Further, Murphy did not provide reports of its activities as requested by LeBleu. When the payments were reduced in November of 1983, LeBleu told Murphy that he had to produce new business or else the Consultant Agreement would be terminated. In December of 1983, after the payments were reduced from $500.00 a week to $250.00 a week, Murphy advised MP & L of this fact, a matter which LeBleu interpreted as Murphy's "bad mouthing" CMI to MP & L. In January of 1984 Connie LeBleu, acting on behalf of herself and the corporations, advised Murphy that she regarded the Consultant Agreement as terminated.

B.
On February 16, 1984, Jim Murphy & Associates, Inc., commenced this civil action by filing its complaint in the Chancery Court of the First Judicial District of Hinds County, Mississippi. Murphy charged breach of contract and asked a judgment for amounts due under its contract together with an order directing that CMI and LeBleu make the $2,000.00 monthly payment so long as they "or any one of them, or their assigns, are engaged in work under a painting contract at Grand Gulf." Murphy also sought pre-judgment interest and costs.
LeBleu and her corporations answered, raising as affirmative defenses that the Consultant Agreement was void for lack of consideration and unenforceable in consequence thereof; that the agreement was induced by fraud and misrepresentation; that Murphy had breached the agreement. LeBleu also charged that Murphy had breached the agreement, in addition to other defenses. LeBleu also alleged individually that she had signed the Consultant Agreement under business compulsion and duress. CMI filed a counterclaim for the payments made to Murphy.
The matter was called for trial in Chancery Court on September 19, 1984.
On October 17, 1984, the Chancery Court filed an opinion dismissing Murphy's complaint. Specifically, the Court held that the April 14, 1982, Consultant Agreement was based upon "past consideration" which were "rendered to Delta Painters" before CMI and LeBleu ever came into the picture, even though
at first blush it would seen that the plaintiff [Murphy] has a binding contract which would entitle it to $2,000.00 per month so long as the defendants or any of them actually performed painting at the Grand Gulf Nuclear Installation.
In short, the Chancery Court held that, with respect to obtaining the contract, Murphy had no claim against LeBleu and her two corporations. On the subject of post-contract services, the Court found that Murphy "basically ... did nothing for the Defendants [LeBleu and her corporations] after the contract of April 14, 1982. It did not perform any of the duties which it had agreed to perform... . Granting that Defendants did not call on the Plaintiff for assistance; none was actually required or needed."
Finally, the Chancery Court held that Murphy "has been well paid for the time that it spent in assisting Defendants after *891 April 14, 1982, and that if any other monies are owed to the Plaintiff, it should recover those from Delta Painters."
On October 24, 1984, the Chancery Court entered its final decree providing that Murphy "take nothing against and from Defendants, Connie LeBleu, Coatings Manufacturers, Inc., and Coatings of Mississippi, Inc." The counterclaim against Murphy was similarly dismissed. This appeal has followed.

III.

A.
We first inquire whether the April 14, 1982, Consultant Agreement was unenforceable as predicated upon past considerations. The Chancery Court considered that Murphy had already done everything it was supposed to do in connection with securing the Grand Gulf painting contract for Delta Painters before CMI and LeBleu "actually came into the picture." The Court further stated "I believe the law is clear that past consideration is no consideration relative to a contract of this type." In certain contexts there is validity to this notion, e.g., Leggett v. Vinson, 155 Miss. 411, 422, 124 So. 472, 475 (1929); Bell v. Oates, 97 Miss. 790, 793, 53 So. 491, 492 (1910); Gregory v. Hardy, 53 Ala.App. 705, 304 So.2d 209, 214-15 (1974).
There are two well established corollary principles, each involving the presence of past considerations. First, a contract founded partly on a past consideration and partly on an executory consideration is enforceable, although in a sense no resort to the past consideration need be had as the new or executory consideration is conceptually adequate to support enforceability of the contract. For example, in Lowndes Cooperative Association v. Lipsey, 240 Miss. 71, 126 So.2d 276 (1961) a general manager had worked for the cooperative for 31 years. The co-op offered the manager a retirement plan "provided he cooperates with the board of directors and the new managers." The manager accepted the retirement plan which the co-op later attempted to terminate. The court held the co-op legally obligated to pay the retirement benefits. The manager had retired without objection; had promised to cooperate with the board of directors and the new manager and had in fact done what he had promised to do. What is important for present purposes is that the manager's primary consideration given the co-op for the retirement benefits was his 31 years of prior service. The court held his promise to cooperate in the future sufficient to support a contract with the co-op wherein the co-op was obligated to pay the retirement benefits. This is consistent with our general law regarding consideration in contracts to the effect that we do not weigh the quantum of consideration of a contract so long as it is something of real value. If there is a benefit to the promisor or a detriment to the promisee, that is sufficient. American Olean Tile Co. v. Morton, 247 Miss. 886, 893, 157 So.2d 788, 790 (1963); Ogle v. Durley, 223 Miss. 32, 43, 77 So.2d 688, 693 (1955); Dabbs v. International Minerals & Chemical Corp., 339 F. Supp. 654, 664 (N.D.Miss. 1972), aff'd. 474 F.2d 1344 (5th Cir.1973).
To be sure, the joint venture was bound unto Murphy prior to the April 14 contract. Without contradiction, after the formation of the joint venture but prior to the joint venture's July 31 contract with Middle South Energy, John Jeter, as principal in Delta Painters, agreed with Murphy that Murphy's fee would become the obligation of the joint venture, to be paid out of the joint venture's proceeds of the Grand Gulf contract.
We have considered generally the nature of that legal relationship we label joint venture in Hults v. Tillman, 480 So.2d 1134, 1141-47 (Miss. 1985); Keppner v. Gulf Shores, Inc., 462 So.2d 719, 722-25 (Miss. 1985); and Sample v. Romine, 193 Miss. 706, 726-29, 8 So.2d 257, 260-62 (1942).
We regard as elementary that one member of a joint venture has the power to obligate the entire venture within its scope. Tansil v. Horlock, 204 So.2d 457, 461 (Miss. 1967); Kilgore Seed Co. v. Lewin, 141 So.2d 809, 811 (Fla.App. 1962); Gibson *892 v. Northeast National Bank, 602 S.W.2d 337, 341 (Tex.Civ.App. 1980); Murphey, Taylor & Ellis, Inc. v. Williams, 223 Ga. 99, 153 S.E.2d 542, 545 (Ga. 1967).
The only factual dispute reflected by the record is whether CMI and LeBleu knew Jeter and Delta Painters had obligated the joint venture to Murphy  LeBleu denies this, although the fact that CMI's office made weekly payments for some 18 months to Murphy would seem powerful evidence to the contrary. The point for the moment is LeBleu's knowledge is irrelevant, as one joint venturer can obligate the other venturer on matters within the scope of the joint venture without the knowledge of the other joint venturer. Gibson v. Northeast National Bank, 602 S.W.2d 337, 341 (Tex. Civ.App. 1980); 46 Am.Jur.2d Joint Ventures § 57; 48A C.J.S., Joint Ventures § 26.
Sufficiently analogous to merit mention is Murphey, Taylor & Ellis, Inc. v. Williams, 223 Ga. 99, 153 S.E.2d 542 (1967). There a son owned a shopping center. The son hired a broker as a real estate agent to obtain leases. The broker's commission was to be five percent of the gross rentals. The broker negotiated a tentative lease with Piggly Wiggly, but the lease did not become effective because the building could not be completed within the time specified in the lease. The son then deeded the property to his father. The broker continued to negotiate with Piggly Wiggly and obtained a second lease. The second lease was between the father and son, as lessors, and Piggly Wiggly, as lessee.
The broker never had a contract directly with the father. The father refused to pay the broker's commission. The broker sued both the father and son, as joint venturers. The Court held that since the father/son lessors were joint venturers, the contract with the son was binding on the father, and the father and the son were jointly liable for the commissions earned by the broker.
A similar situation exists in the case here. Just as the real estate broker had in Murphey, Taylor an agreement with the owner to be paid a monthly commission out of leases obtained by the broker, Murphy here had an agreement with the potential owner of the Grand Gulf contract, Delta Painters, for monthly compensation out of proceeds of the contract for assistance in obtaining or "brokering" the contract. Just as the former owner of the shopping center entered into a joint venture with the new owner of the shopping center, Delta Painters entered into a joint venture with the new co-owner of the contract, CMI. The new co-owner of the shopping center, the joint venturer, was held liable for the broker's commission negotiated prior to the formation of the joint venture for the lease that benefitted the joint venture. Here, CMI/LeBleu are liable for Murphy's commission for helping to obtain the contract that benefitted the joint venture.

B.
This gets us into the second reason why CMI and LeBleu may not avoid enforceability of the Consultant Agreement of April 14, 1982, independent of the fact that the contract was supported by legally sufficient considerations in the form of Murphy's promise to perform services in connection with the Grand Gulf painting contract in the future. That second reason is this. What we have before us is a single ongoing contractual relationship. The form and manner of identification of the terms of that relationship have changed  from the spoken word to the written. The parties on one side of the relationship changed  from Delta to Delta/CMI to CMI/LeBleu. But it remains one contract, at least for purpose of ascertainment and enforcement of the rights and obligations of Murphy, on the one hand, and the painting contractor on the other. What has happened is that there have been two assumptions on one side of the contract. Delta Painters entered a bilateral contract with Murphy. In July of 1981 the joint venture assumed all of Delta's rights and obligations under that contract. The combined effect of the April 14, 1982, Consultant Agreement and the January 26, 1983, dissolution effected an assumption by CMI/LeBleu of the joint ventures rights *893 and obligations under that contract. But it is still just one contract.
CMI and LeBleu's argument is needlessly formalistic and technical. They deny any obligation to Murphy under the unwritten Murphy-Delta agreement because they were not parties to it. They deny any obligation by virtue of the joint venture relationship with Murphy because CMI and LeBleu claim they did not know of or agree to that arrangement. They deny obligations under the April 14 Consultant Agreement because it was supposedly based upon past considerations. In short, CMI-LeBleu insists that the law be considered a series of highly formalistic strictly channeled, well-guarded routes to justice. If Murphy fails to thread the needle perfectly, his claim fails.
If we step back from formalism, CMI/LeBleu's obligation to Murphy is easily seen. When we cease our concentration on individual trees, the forest becomes apparent. What we have is a single ongoing relationship having several transitional stages. Murphy had an unwritten Consultant Agreement with Delta Painters. After the Grand Gulf painting contract had been tentatively obtained, economic exengencies necessitated Delta Painters acquisition of a joint venturer, CMI and LeBleu. Murphy's relationship transferred from Delta Painters, individually, to Delta/CMI. In April of 1982 Jeter's indictment and Delta's precarious financial situation led Murphy to seek a formal written agreement with CMI and LeBleu. The terms of that agreement are in no material respect at variance with the then extant oral agreement between Murphy and the joint venture. Then in January of 1983 Delta dropped out of the picture entirely and CMI/LeBleu took over the Grand Gulf painting contract. It was a year thereafter before CMI/LeBleu attempted to terminate Murphy's services.
For the moment it is sufficient to say that at each stage of CMI/LeBleu's evolution into full control of the Grand Gulf painting contract, CMI/LeBleu was legally obligated to Murphy and CMI's/LeBleu's conduct reflected recognition of that obligation. Moreover, in both forms  the unwritten agreement with Murphy and the joint venture, as well as the written Consultant Agreement of April 14, 1982  the covenants and agreements of the two parties were the same; that is, Murphy was to perform services in procuring and managing the Grand Gulf painting contract and for his services was to be paid $2,000.00 per month for the duration of the contract. It would be the height of formalistic legerdemain to allow CMI/LeBleu to escape their obligations under the contract simply because of Murphy's nervousness in April of 1982 following Jeter's indictment, which led Murphy to reduce to writing with CMI/LeBleu its agreement theretofore existing with the joint venture.
Murphy's first assignment of error, accordingly, is well taken. CMI/LeBleu was contractually obligated under our law to Murphy as outlined above. Whether there was a breach of that obligation such as would relieve CMI/LeBleu is another matter.

IV.
Notwithstanding, CMI/LeBleu argue that Murphy breached whatever agreement it may have had in that it failed to perform services called for by the contract. By reason thereof, CMI/LeBleu denies any obligation to pay further, notwithstanding that it may originally have been obligated under the contract.
CMI/LeBleu rely here upon that portion of the Chancery Court's April 17, 1984, opinion which appears to hold that there was a breach of the contract, to-wit:
When we look at the contract we see that in the last paragraph the plaintiff [Murphy] agreed to serve the defendants [CMI/LeBleu] "as a marketing consultant, adviser and representative, so long as such monthly fees are paid." Basically, the plaintiff did nothing for the defendants after the contract of April 14, 1982. It did not perform any of the duties which it had agreed to perform. The fact that the plaintiff did not perform the things which it had agreed to do it would seem to the court would *894 forgive the defendants of any obligations on the contract. Granted that defendants did not call on the plaintiff for assistance; none was actually required or needed... . The court is of the opinion that plaintiff has been well paid for the time that it spend in assisting the defendants after April 14, 1982, and that if any other monies are owed to plaintiff it should recover those sums, if any, from Delta Painters, Inc.
This latter sentence, of course, is quite wrong. The Chancery Court's value judgment that Murphy has been "well paid" is beside the point. Assuming no breach, the question is whether Murphy was paid in accordance with the contract. The agreement of the parties, i.e., the privately made law between the parties, not the value judgment of the Chancery Court, is the measure of the adequacy of the payments made to Murphy.
Our concern of the moment, however, is whether Murphy failed in any obligations owed to CMI/LeBleu. In this connection we certainly accept established limitations upon our scope of review of the conclusions of the Chancery Court which are essentially findings of fact. Where there is substantial evidence supporting those findings, we have no authority to disturb the conclusions reached by the Chancery Court notwithstanding that we as an original matter might have found otherwise. See, e.g., Culbreath v. Johnson, 427 So.2d 705, 707-09 (Miss. 1983); Richardson v. Riley, 355 So.2d 667, 668 (Miss. 1978).
The measure of Murphy's obligations is the contract. The Chancery Court considered the essence of those obligations those provided in the April 14, 1982, written Consultant Agreement, to-wit: Murphy was to serve as CMI/LeBleu's "marketing consultant, adviser and representative." Specifically, Murphy was obligated to represent CMI/LeBleu in any and all aspects of the painting and coatings contract at the Grand Gulf Nuclear Station. Its obligation in the end was to see that Middle South Energy/MP & L did not exercise the termination clause in the painting contract but rather that, first the joint venture and thereafter CMI/LeBleu kept the contract. The importance of this service to CMI/LeBleu is brought home by the fact for the eighteen month period from July 1982 through December 1983 CMI's monthly receipts from Middle South Energy under this contract were $197,620.75.
Moreover, the record reflects without contradiction that, following the execution of the painting contract between the joint venture and Middle South/MP & L, Murphy performed quite a few services. He went down to the jobsite and visited with the painting superintendent. He monitored attempts by competitors to hire away Delta/CMI workers and dealt with other problems. He assisted in working out an overpayment made by MP & L to the joint venture. He represented the joint venture first and CMI thereafter in the various transition phases leading to CMI's assumption of the entire contract.
What is clear from this record is that Murphy had few if any specific responsibilities. It had one general overreaching responsibility, however, and that was to see that nothing caused first the joint venture and ultimately CMI to lose the lucrative Grand Gulf painting contract. In this it was successful, and the record makes clear that this was anything but a trouble-free contract. Indeed, little common sense is required to perceive that Delta's financial difficulties augmented by the federal indictment of Jeter could well have jeopardized the entire contract in April of 1982 and, as well, thereafter, the complete withdrawal of Delta from the joint venture and the painting contract between November of 1982 and January of 1983.
Seen in this light, it appears that the Chancery Court's conclusion that Murphy did essentially nothing after April 14, 1972, is more a function of the Court's misperception of what it is that Murphy was obligated to do under the contract than a rejection of the evidence tendered by Murphy of what it did in fact. In any event, we find it inescapable the conclusion that the Chancery Court was manifestly wrong.
We note CMI/LeBleu's contention that Murphy was somehow obligated to help it *895 find other bids. The Chancery Court made no finding on this point, and indeed his opinion makes clear that it considered Murphy's obligations limited to the Grand Gulf painting contract. Our review of the evidence convinces us without serious doubt that Murphy undertook no obligations to CMI/LeBleu beyond the scope of the Grand Gulf painting contract.
In short, Murphy committed no breach of contract. The Chancery Court's holding to the contrary is reversed and rendered.

V.
Having held that there was and is a valid, subsisting and ongoing contract between Murphy, on the one hand, and CMI/LeBleu on the other, we come to the matter of relief. That contract obligated CMI/LeBleu to pay Murphy the sum of $2,000.00 per month for the life of the Grand Gulf painting contract. The record suggests that through September 15, 1984, Murphy had been paid $34,450.00. Murphy claimed an arrearage due as of that date of $23,550.00. The record further reflects that at the time of trial CMI still held and was carrying out work under the painting and coatings maintenance contract at the Grand Gulf nuclear installation. We, of course, have no evidence before us regarding what has happened since that time.
Under the circumstances we remand to the Chancery Court and direct that Court to take such evidence as may be appropriate to ascertain the sums due from CMI/LeBleu to Murphy under the contract. As we are concerned here with liquidated amounts due upon specific dates, we direct further that Murphy's prayer for pre-judgment interest be granted. Estate of Van Ryan v. McMurtray, 505 So.2d 1015, 1019 (Miss. 1987); City of Mound Bayou v. Roy Collins Construction Co., 499 So.2d 1354, 1361 (Miss. 1986); Stanton & Associates, Inc. v. Bryant Construction Co., 464 So.2d 499, 502 (Miss. 1985), which should be computed on each past due payment from that date same became due and was not paid. See Brand v. Brand, 482 So.2d 236, 237-38 (Miss. 1986).
REVERSED, RENDERED IN PART, AND REMANDED IN PART.
WALKER, C.J., ROY NOBLE LEE and HAWKINS, P.JJ., and PRATHER, SULLIVAN, ANDERSON and GRIFFIN, JJ., concur.
DAN M. LEE, J., dissents.