658 So.2d 1367 (1995)
IUKA GUARANTY BANK
v.
Nancy BEARD.
No. 91-CA-01272-SCT.
Supreme Court of Mississippi.
June 29, 1995.
Rehearing Denied August 24, 1995.
*1369 Roger H. McMillin, Jr., Jackson, Lester F. Sumners, Hickman Sumners Goza & Gore, New Albany, for appellant.
Phil R. Hinton, Wilson & Hinton, Corinth, for appellee.
En Banc.
SULLIVAN, Justice, for the Court:
Nancy Beard filed suit in the Circuit Court of Tishomingo County against Iuka Guaranty Bank ("Iuka"), alleging an intentional breach of contract in their failure to cancel a deed of trust upon her August 23, 1985, satisfaction of the balance due on her loan from Iuka. The failure to cancel this instrument subsequently resulted in the foreclosure of Beard's property in January of 1990. In addition to requesting actual damages, Beard sought statutory damages pursuant to Miss. Code Ann. § 89-5-21, or in the alternative, punitive damages for the alleged intentional breach of contract. Iuka answered claiming that Beard, upon receiving proper notice, failed to satisfy all of her indebtedness to Iuka. After trial on the merits, the jury returned a verdict for Beard in the amount of $5,000 in actual damages, and $20,000 in statutory damages. Iuka filed a motion for a judgment notwithstanding the verdict or, in the alternative, for a new trial. It is from the denial of this motion which Iuka appeals. Beard also sought to amend her complaint under M.R.C.P. Rule 15 to reflect the jury's award of actual damages which were not requested in the initial complaint. The trial court denied this motion, concluding that it lost jurisdiction to make a ruling once Iuka perfected its appeal.

FACTS
Nancy Beard was a licensed real estate broker with twenty years experience working for her husband at P.O. Beard Real Estate before returning to her former teaching career in 1984. Nancy and her husband, P.O., were the joint owners of Lot 7 and Lot 44, two sections of property in the same subdivision. The Beards' home was built on Lot 7, and Lot 44 remained undeveloped.
On November 23, 1982, the Beards obtained a loan and executed a note to Iuka Guaranty Bank for the principal sum of $46,512.31. Previous notes to Iuka in the sum of $1,300 and $15,000 were consolidated into the balance of this new note on the advice of Gene Jourdan, a banker at Iuka Guaranty since 1962, who noted that P.O. had been having difficulty making payments on previous loans. The Beards signed two deeds of trust as security for the 1982 loan. One deed of trust gave the bank a first mortgage on the vacant Lot 44, and the other, a second mortgage position on Lot 7. Iuka's interest in Lot 7 followed an outstanding $12,000 mortgage previously given to Nancy's mother. Both of these deeds of trust contained a "dragnet clause" asserting that the instruments secured not only the principal scheduled debt, but also any other separate or joint indebtedness owed to Iuka by either party.
Nancy maintained that P.O. was responsible for making all of the necessary loan payments. P.O. informed Nancy in August of 1985 that Iuka was anticipating foreclosure *1370 due to his failure to make the necessary installments on the 1982 loan. Nancy had been unaware of this problem because Iuka had failed to provide her with notice, having addressed all of the correspondence to P.O. Gene Jourdan testified that the Beards were erratic with their payments on the 1982 loan beginning with their first payment. He claimed that the installments were 90 days past due as early as mid-1983.
P.O. scheduled a meeting with Fidelity Federal Savings and Loan ("Fidelity Federal") in August of 1985 in hopes of refinancing the Iuka loan. Nancy testified that she received a $38,000 loan in her own name from Fidelity Federal to satisfy the entire Iuka debt. On August 23, 1985, Nancy and P.O. signed a deed of trust on Lot 7 to Fidelity Federal as security for the new loan. As part of the Fidelity Federal loan agreement, Nancy convinced her mother to subordinate her mortgage interest behind Fidelity Federal's interest.
Nancy and P.O. met with Gene Jourdan at Iuka on the same day and forwarded the entire outstanding balance of the 1982 Iuka loan using the $38,000 in proceeds obtained from Fidelity Federal. Nancy also expressed dissatisfaction about not having received personal notices from Iuka in the past. She testified that before they satisfied the loan, Jourdan assured them that he would immediately cancel the deeds of trust on Lot 7 and Lot 44 upon payment. She claimed that Jourdan repeated his guarantees that they had successfully fulfilled all of their obligations to Iuka necessary to release the two deeds of trust. She testified that Jourdan made no mention of any other debts preventing Iuka from releasing both deeds of trust. Though the Beards paid the entire balance of the loan on August 23, 1985, Jourdan testified that the bank would have been equally content had the Beards merely tendered their overdue payments. Jourdan said he canceled the Lot 7 deed of trust on the day following full payment of the 1982 loan. P.O., in fact, received another loan of $406 in order to fully cancel the loan. Jourdan testified that he did not specifically remember the conversations between the parties on this day.
Nancy and P.O. subsequently divorced. In January of 1990, some five years later, Nancy learned that the deed of trust on Lot 44 had not been released. She said that she received a letter from Iuka indicating that it was initiating foreclosure proceedings on Lot 44. Notice of the foreclosure appeared in the paper under Nancy and P.O.'s name. It also listed under P.O.'s name individually for his personal loans dating back to March 26, 1973. Jourdan produced records showing that P.O.'s individual notes had been properly renewed by the bank. Lot 44 had been registered as security for the loan afforded P.O. on March 26, 1973. P.O. had been renewing this debt throughout the 1980's by merely paying the interest due on the loans. Jourdan explained that P.O.'s previous debts had become commingled with the 1982 loan since P.O. had renewed his original note so many times. P.O. had even continued to borrow money after the 1982 loan was satisfied. Nancy had neither borrowed additional money from Iuka, nor signed any of the notes which were given or renewed by her husband. She was not aware of her husband's previous dealings with Iuka even though she had worked at his real estate office for twenty years. However, the deed of trust on Lot 44 remained properly recorded in the chancery court's office even after the Beards paid the balance owed on the 1982 loan.
Prior to foreclosure, Jourdan received a letter from Nancy requesting that the deed of trust on Lot 44 be released. Jourdan denied the request, ultimately purchasing Lot 44 on behalf of Iuka in the foreclosure sale for the sum of $3000. He estimated that the value of Lot 44 at foreclosure was approximately $3000. He said this value had not changed since P.O., offered it as security for his 1973 debt because of continued poor access to the property. He claimed that Iuka lost $10,189.98 in the foreclosure. Bruce Dillingham, a real estate appraiser for Fidelity Federal, appraised Lot 44 at a 1990 value of $10,500.

*1371 I.

DID THE DRAGNET CLAUSE OF THE DEED OF TRUST ON LOT 44 SECURE THE SEPARATE DEBTS OF P.O. BEARD?
A properly executed and unambiguous dragnet clause in a deed of trust is enforceable according to its terms. Kelso v. McGowan, 604 So.2d 726, 729 (Miss. 1992); Trapp ex rel. First Miss. Bank of Commerce v. Tidwell, 418 So.2d 786, 787, 792 (Miss. 1982). A dragnet clause is enforceable when both parties have agreed to the clause, and there was no fraud in the making of the contract. Walters v. Merchants & Manufacturers Bank, 218 Miss. 777, 785, 67 So.2d 714, 717-18 (1953). In the absence of allegations of fraud or ambiguities, the clause should be construed as written to cover subsequent debts created by one of the joint mortgagors individually. Id. There is no requirement that the co-tenants have knowledge of the existence of other debts, or each others' consent to the creation of debt and the attendant lien against the property, in order for the dragnet clause to be enforceable. Newton County Bank v. Jones, 299 So.2d 215, 219-20 (Miss. 1974); Holland v. Bank of Lucedale, 204 So.2d 875, 877 (Miss. 1967).
On November 23, 1982, Nancy and P.O. borrowed approximately $46,000 from Iuka and executed a deed of trust granting Lot 44 as security for the loan. The deed of trust contained a dragnet clause asserting that the instrument incorporated all past and future debts owed jointly or severally by Beard and her husband. The facts of this case demonstrate that the dragnet clause was mutually agreed upon through the loan process employed by Iuka. The clause was clearly written to encompass the debts which P.O. owed Iuka individually. As there are no allegations of fraud or ambiguities surrounding the contract, the dragnet clause in the deed of trust validly granted Lot 44 to Iuka as security for all past and future debts owed by the Beards jointly or individually. This effectively included the individual debts of P.O. which were outstanding even before the 1982 loan was extended. Nancy Beard concedes this issue; instead, she argues that the Lot 44 deed of trust containing the dragnet clause was modified by subsequent agreement.

II.

WAS THERE ANY PROOF PRESENTED UPON WHICH THE JURY COULD BASE ITS FINDING THAT NANCY BEARD AND IUKA MUTUALLY AGREED TO AMEND THE DEED OF TRUST ON LOT 44 NEGATING THE DRAGNET CLAUSE?
The jury concluded that the dragnet clause had been abrogated by a subsequent agreement between the Beards and Iuka whereby Iuka agreed to cancel the deed of trust notwithstanding any other joint or individual debts owed by the Beards in return for the Beard's full payment of the 1982 loan. Iuka contends that there was absolutely no evidence upon which a jury could find the existence of an agreement subsequent to the execution of the deed of trust on Lot 44.
The proponent of a contract or a modification thereof has the burden of proof. Bradley v. Howell, 161 Miss. 346, 351, 133 So. 660, 661 (1931). Nancy Beard's testimony pertaining to the day that she returned with the money to satisfy the Iuka loan provided the only evidence in support of the alleged existence of a subsequent agreement. Beard's testimony was as follows:
Phil Hinton:
Q. Go ahead and tell me then what your discussion, your arrangement was with Mr. Jourdan that day.
Nancy Beard:
A. Met with Mr. Jourdan in his office. P.O. and I and Gene met in his office; gave him the $38,000  it was some more than that but whatever the difference was we had in cash to go with it; and paid him off. And I asked at the time, Will you cancel the deeds of trust? Oh, yes. We'll *1372 take care of that right away. No problem. We got up to go out the door and he's behind me and he said, By the way, Nancy, did they require that extra lot that we had over here? And I said, No, sir they didn't because they got a first mortgage [on Lot 7] whereas you had the second. And he said, That's good, Nancy. I know you didn't like to do this but, he said, at least you got this lot free and clear out of this.
Q. Did you ask him to release both deeds of trust before you gave him that 38, 39, whatever it was?
A. Yes, sir. I said, This takes care of anything I owe, anything that's concerned with this. He said, Oh, yes. I appreciate your help and cooperation on this.
Q. Okay. Now, did, at this time now on this date or for that matter any time up until the end of 1989, did Gene Jourdan say, No, we're not going to release that deed of trust on this Lot 44?
A. No, sir.
Q. Did he say, Nancy, I'm sorry it's security for other debts P.O. has here?
A. No, sir.
Q. Did he tell you on the date that this happened did he tell you, There are other debts today and I cannot release this?
A. No, sir. He never said he wouldn't release them. In fact he said the contrary, Yes, I'll take care of it. I'll see to it that the deeds of trust are released.
Gene Jourdan of Iuka Guaranty simply testified that he could not precisely remember what he proposed to Beard on the day she tendered the loan payment. Regardless of whether this alleged agreement was binding, this Court finds this evidence sufficient to establish a manifestation of mutual assent. Beard satisfied her burden of proof because the evidence she provided the jury was never contradicted or discredited by the defense. The uncontradicted evidence sufficiently demonstrated that if Beard repaid the $46,000 loan extended in 1982, then Iuka would cancel the deed of trust on Lot 7 and Lot 44. The existence of such an agreement was somewhat corroborated when evidence introduced later in the proceedings revealed that Iuka released the Lot 7 deed of trust the day after Beard repaid the 1982 loan. The Lot 7 deed of trust contained a valid dragnet clause the same as that found in the deed of trust on Lot 44. Consequently, Iuka's argument that there was no evidence supporting the existence of an agreement is without merit.

III.

WAS THE AGREEMENT NEGATING THE DRAGNET CLAUSE SUPPORTED BY ANY NEW CONSIDERATION IF SUCH AN AGREEMENT EXISTED?
While there was sufficient evidence demonstrating a subsequent agreement between Iuka and Beard, consideration must exist to make it legally binding on Iuka. A written contract may be modified by a subsequent agreement, but the law of this state is that such an agreement must be supported by new or additional consideration. Edrington v. Stephens, 148 Miss. 583, 592, 114 So. 387, 389 (1927). Consideration is sufficient if there is any benefit to the promisor or any loss, detriment, or inconvenience to the promisee. Jim Murphy & Assocs. v. LeBleu, 511 So.2d 886, 891 (Miss. 1987); Miller v. Bank of Holly Springs, 131 Miss. 55, 65, 95 So. 129, 130 (1922). Consideration must constitute legal detriment as opposed to detriment in fact. In the case at hand, we find that Beard indeed suffered a legal detriment in association with her agreement to fully satisfy her loan in return for Iuka's promise to cancel the deed of trust. Faced with the possible foreclosure of Lot 44, Beard prematurely paid the balance of the $46,512.31 loan to Iuka in full. Regardless of how Beard was able to obtain the funds to pay the entire balance due, we find that the act of prematurely satisfying her debt to Iuka was a legal detriment sufficient to enforce the subsequent agreement which the jury found existed between Nancy and Iuka.
Iuka argues that Nancy Beard was already under a legal obligation and pre-existing duty *1373 to pay off this loan, and therefore, her actions did not constitute legally sufficient consideration. In Memphis Automatic Music Co. v. Chadwick, 164 Miss. 635, 639-40, 146 So. 137, 137-38 (1933), a customer purchased a piano in exchange for two installment notes, but the customer executed new notes payable when the installments became due. At the time the notes were renewed, the music store promised to cure certain defects in the piano. The customer later defaulted on the new notes, but claimed that the music store breached their promise to repair the piano. This Court did not enforce the promise to cure the defects, finding that this promise was not supported by consideration because the notes were already past due. Id. In Barcroft v. Armstrong, 198 Miss. 565, 579-80, 21 So.2d 817, 819 (1945), the Court concluded that the promisor's promise to lower the interest rate on a note in return for the promisee's promise to pay the property taxes on the land securing the note was unenforceable for lack of consideration because the promisee was already under the legal obligation from the original agreement to pay the property taxes.
The Barcroft and Chadwick cases are distinguishable because they involved obligations which were definitively past due or pre-existing. In this case, the amount which Nancy paid, the full amount of the debt remaining on the loan, was not legally due. Only the past due installments were actually due, not the total unpaid difference of the loan. The facts show that Nancy was not legally required to fully satisfy the loan at the time full payment was tendered. Jourdan testified that although payments were substantially in arrears, Nancy was merely under a duty to cover the overdue payments and bring them up to date. Furthermore, Iuka admittedly had not taken the mandatory contractual steps necessary to invoke the acceleration clause in the promissory note. The right of acceleration clearly did not exist at the time the subsequent agreement to cancel the deed of trust was formed. Finally, as indicated by the exchange supra between Jourdan and Nancy, the mutual obligations of the parties were bargained for at a point in time before the Beards satisfied their loan obligations. There was sufficient evidence to show that the proposed agreement was not just an afterthought. It follows that the subsequent agreement which the jury found to exist was not void for lack of consideration.

IV.

DID THE COURT ERR IN NOT GRANTING A NEW TRIAL UNDER 60(B)(1) OF THE MISSISSIPPI RULES OF CIVIL PROCEDURE DUE TO MATERIALLY FALSE MISREPRESENTATIONS MADE TO THE JURY BY NANCY BEARD REGARDING THE FACTS SURROUNDING THE OBTAINING OF ALTERNATE FINANCING ON THE HOUSE?
Nancy Beard indicated at trial that she alone signed the promissory note on the loan acquired from Fidelity Federal which produced the proceeds used to satisfy the debt to Iuka. At the hearing on Iuka's post-trial motion for a new trial, Iuka produced the loan agreement between Nancy and Fidelity Federal. This exhibit demonstrated that both Nancy and P.O. had signed the promissory note to Fidelity Federal. Contrary to Beard's assertions at trial, she and P.O. were equally liable for the loan taken out for the purpose of satisfying the debt to Iuka. Iuka argues that Nancy's testimony comprised a misrepresentation authorizing it to a new trial. Iuka cites Rule 60(b)(2) of the Mississippi Rules of Civil Procedure as support, but Rule 60(b)(1) is the rule consistent with Iuka's contention. Rule 60(b)(1) permits a trial court to relieve a party from a final judgment on account of a misrepresentation by an adverse party.
Appellate review of a motion for relief under Rule 60(b) is limited to whether the trial court abused its discretion by ordering or denying relief. January v. Barnes, 621 So.2d 915, 927 (Miss. 1992); Overbey v. Murray, 569 So.2d 303, 306 (Miss. 1990); *1374 Stringfellow v. Stringfellow, 451 So.2d 219, 221 (Miss. 1984). It is difficult to determine the trial court's grounds for overruling the motion in the present case because the attorneys' arguments were made "off the record," and the order overruling the post-trial motion gave no indication of the trial court's legal justification for denying relief. The movant, however, has the burden to prove fraud, misrepresentation or other misconduct by clear and convincing evidence. Stringfellow, 451 So.2d at 221.
In support of its position, Iuka offered into evidence the loan papers representing the loan from Fidelity Federal to the Beards. The loan papers showed that P.O. and Beard both signed the promissory note contrary to Beard's assertions that she alone signed the note. While there is clear evidence showing that Beard's testimony was not factually correct in this regard, there is no record of Iuka having proven all of the elements necessary to show fraud or misrepresentation. See Berkline Corp. v. Bank of Mississippi, 453 So.2d 699 (Miss. 1984) (defining elements necessary to prove negligent misrepresentation); Stringfellow, 451 So.2d at 221 (defining elements necessary to prove fraud).
First, we find that Iuka failed to adequately preserve the record for appeal. There is no direct evidence that the misrepresentations were intentional so as to rise to the level of fraud. Without any record of Iuka having demonstrated the elements in support of its motion, it is difficult to conclude there was an abuse of discretion. More importantly, this evidence was not material to the legal issues in this case. The fact that Beard paid the loan in full before it was ultimately due provided the legal detriment or consideration to validate the subsequent agreement with Iuka. Her husband's joint signing of the Fidelity Federal loan does not affect the fact that the Iuka loan was satisfied prematurely. Since consideration existed regardless of which party signed the Fidelity Federal note, we must conclude that Beard's incorrect testimony was not significant or material to the outcome of this trial.
Iuka argues that Beard wrongly elicited sympathy from the jury by claiming she alone signed the Fidelity Federal note. This argument, without anything else in the record in support of Iuka's position, does not demonstrate an abuse of discretion by the trial court. It is mere speculation. While this information would have been valuable for impeaching the credibility of Nancy Beard, it does not alter the fact that she was liable for repayment of the Fidelity Federal loan. The issue of whether Nancy alone, or with her husband jointly, signed the promissory note from Fidelity Federal is relevant merely to determine the rights of contribution between Beard and her husband. P.O. was not a party to this suit, and the issue of contribution between the spouses was not a concern. The fact remains that Nancy Beard was undeniably liable for repayment of both the Iuka and the Fidelity Federal loans.
This information was equally available to Iuka before the trial, and they were free to cross-examine Beard on this fact had they bothered to read this document before trial. "Rule 60(b) provides for extraordinary relief which may be granted upon an adequate showing of exceptional circumstances, and ... neither ignorance nor carelessness on the part of an attorney will provide grounds for relief." Stringfellow, 451 So.2d at 221. Consequently, it was not an abuse of discretion to deny Iuka a new trial under Rule 60(b).

CONCLUSION
The deed of trust covering Lot 44 contained a dragnet clause incorporating all past and future debts owed to Iuka by Nancy or P.O. Beard jointly or individually. It is conceded by Beard that this dragnet clause was valid when executed. The jury concluded that the dragnet clause was abrogated by a subsequent agreement between the Beards and Iuka whereby Iuka promised to cancel the Lot 44 deed of trust notwithstanding any other joint or individual debts owed by the Beards in return for the full satisfaction of the 1982 loan. Through Beard's unrefuted testimony, she provided a sufficient amount *1375 of evidence for the jury to find that such an agreement existed. Furthermore, we conclude that this subsequent agreement was enforceable because Beard suffered a legal detriment by repaying the entire loan prematurely. The trial court did not abuse its discretion by denying Iuka a new trial on the grounds of misrepresentation under Rule 60(b)(1) of the Mississippi Rules of Civil Procedure. Beard's inaccurate testimony did not concern a material issue, and the inadequate record on appeal failed to otherwise demonstrate an abuse of discretion. For these reasons, the judgment below in the amount of $5,000 in actual damages, and $20,000 in statutory damages is affirmed.
AFFIRMED.
DAN M. LEE, P.J., and PITTMAN, BANKS, McRAE, JAMES L. ROBERTS, Jr. and SMITH, JJ., concur.
PRATHER, P.J., dissents with separate written opinion joined by HAWKINS, C.J.
PRATHER, Presiding Justice, dissenting:
I respectfully dissent for the following reasons: (1) the proof showed the existence of a legally enforceable dragnet clause in the deed of trust, (2) the proof failed to show that there was any modification of that contract, or if such a modification was found to exist, the proof failed to show any evidence that there was consideration for the alleged subsequent modification. Even if the majority does not agree on the above analysis, then in the alternative, this case should be reversed and remanded for a new trial on the Bank's motion for a new trial under M.R.C.P. 60(b)(1) due to the materially false misrepresentation made to the jury by the Plaintiff.

I. FACTS
P.O. Beard and Nancy Beard were husband and wife in 1982 when these events occurred. P.O. was engaged in the real estate business, both as a broker and buying and selling on his own account. Nancy also was a licensed real estate broker and worked in the office, primarily in a clerical or secretarial capacity according to her testimony.
P.O. and Nancy owned two pieces of property jointly. One was their home place, and the other was an undeveloped lot in the same subdivision. Throughout the transcript, the two properties are referred to by lot number; the home place was Lot 7 and the vacant lot was Lot 44.
Due to fluctuations to the local economy brought on by the cancellation of a nuclear power plant project near Iuka, P.O.'s real estate business suffered some setbacks which resulted in the need to borrow funds from Iuka Guaranty Bank. The loan was made to P.O. and Nancy jointly and was in the approximate amount of $46,000.00. The Bank took a second mortgage position on Lot 7, the home place, and a first mortgage on Lot 44, a vacant lot, as collateral for the loan. The lien was evidenced by two separate deeds of trust, each for the full amount owed of $46,000 for each lot rather than listing both lots in one deed of trust.[1] The deed of trust contained a "dragnet clause" securing her indebtedness of both parties. P.O. has indebtedness owing to Iuka other than the $46,000 loan. A monthly payment on the loan in question was made on November 23, 1982.
Nancy testified that she looked to her husband to make the payments on the loan. From the beginning, however, P.O. had problems meeting the monthly obligation. By August 1985, the loan was substantially in arrears, and the Bank had notified P.O. that it appeared that a foreclosure proceeding was imminent if the matter could not be cleared up.
*1376 In her testimony at the trial, Nancy testified that she then took matters into her own hands and arranged for a loan in her own name alone from Fidelity Federal Savings & Loan to pay off the balance on the $46,000.00 note. The payoff by then was approximately $38,500.00 and she assumed full responsibility for the loan to Fidelity.
This testimony  that she alone assumed the loan  was the testimony proved later to be false. P.O. and Nancy went to the Bank and paid off the $46,000.00 note with the loan proceeds of the Fidelity Federal loan.
The majority opinion on page 7 quotes Nancy's testimony concerning this transaction. First, she gave the banker the money... and paid him off. "And I asked at the time, will you cancel the deeds of trust?" This testimony is insufficient to establish any amendment to the deed of trust. In the sequence of the events as Nancy described them, she paid off the deed of trust first, unconditionally, and then subsequently, she asked, but did not demand, that the banker he cancel the deeds of trust.
Respectfully, I submit that this testimony did not modify the deed to trust on Lot 44 negating the "dragnet clause."
The Bank in 1990 commenced foreclosure action against Lot 44 based upon the deed of trust executed by the Beards. Nancy protested the foreclosure prior to the sale and demanded that the deed of trust be released; however, the Bank proceeded with the sale, which occurred on February 19, 1990. The Bank was the successful bidder at the sale with a price of $3,000.00.
Nancy subsequently brought this action under § 89-5-21 of the Mississippi Code of 1972 for the Bank's alleged failure to release the deed of trust after written demand. Then Bank defended on the basis that it had no legal obligation to release the deed of trust so long as P.O.'s obligation remained outstanding under the "dragnet clause." The jury returned a verdict of $5,000.00 actual damages and attached a further statutory penalty of $20,000.00 under § 89-5-21.[2]

II. ANALYSIS

A. THE DRAGNET CLAUSE
The majority opinion on page 1371 correctly states that "dragnet clauses" are enforceable, as commonly used throughout the banking industry. Its applicability to joint mortgagors without knowledge or consent is also acknowledged. I, therefore, do not repeat the supporting authority here. I do disagree with the conclusion that these facts of a verbal request support a modification of this written and recorded deed of trust in the following section.

B. FAILURE TO TENDER CONSIDERATION
It is well recognized in Mississippi contract law that past consideration cannot form the basis of a valid contract, except in certain situations. See Jim Murphy & Assoc., Inc. v. LeBleu, 511 So.2d 886, 891 (Miss. 1987). In this case, Nancy Beard paid Iuka Guaranty Bank all of the money which Iuka Guaranty considered necessary to release Lot 7 from the deed of trust. However, because the Beards had additional debts with Iuka Guaranty which were not paid, Iuka Guaranty did not release Lot 44, secured by a dragnet clause with a separate deed of trust on each Lot, 7 and 44, for the same business debts. For, Note 8128, which was in existence on August 23, 1985, was later combined with two other notes into Note 6881 on October 19, 1985. It was never paid, but was always secured by real estate, according to bank records).
Nancy Beard alleges that Iuka Guaranty promised to release both lots from the deeds of trust in exchange for her payment of Note *1377 40, which totaled approximately $38,000. However, Nancy Beard asked about the release of the deed of trust by from Iuka Guaranty only after she had paid the loan to Iuka Guaranty. Nancy Beard stated that the issue of Lot 44 (the vacant lot) only came up as an afterthought after the payments.
Since this alleged agreement to amend only occurred after her tender of alleged consideration, her payoff of the $38,000 would only be past consideration, which is insufficient to form a new contract required to negate a dragnet clause. Singing River Mall v. Mark Fields, Inc., 599 So.2d 938, 947 (Miss. 1992) (holding that contract modifications must "meet the requirements for a valid contract," presumably including new consideration). Therefore, this issue alone would cause reversal of this case, since the dragnet clause was not superseded by a new contract, and was legally still binding against P.O. and Nancy Beard.

C. BEARD'S MISREPRESENTATIONS
Iuka Guaranty also urges for reversal and a new trial under M.R.C.P. 60(b), which allows a new trial in cases where fraud has occurred. The allegations of Beard's misrepresentations are these: Nancy Beard testified that she alone signed the promissory note to Fidelity Federal Bank, the bank from which she borrowed the money to pay the Iuka loan. Her statement was a misrepresentation. Nancy, and her husband P.O., cosigned the promissory note to Fidelity Federal on August 23, 1985.
The majority holds that this misrepresentation lacks the scienter for fraud. Scienter for fraud requires either the utterer knowingly lying, or unknowingly misstating himself when he should have known the true facts. Seaboard Planning Corp. v. Powell, 364 So.2d 1091, 1094 (Miss. 1978).
In this case, Nancy Beard should certainly have known if she signed the second promissory note alone, or with her husband, since she makes it a centerpiece of her case. In addition, most people would undoubtedly remember whether they had signed a note of indebtedness for approximately $38,000 alone, or with a co-signer. Scienter is established by itself under the circumstances. The misrepresentation is material because Nancy relies on it to show consideration.
Because the majority could not tell whether her false testimony made the difference in this case, I would reverse and remand for a new trial under M.R.C.P. 60(b). The intent and materiality requirements of fraud are present, as well as the other factors. In addition, Nancy Beard misrepresented facts to the jury. To hold otherwise would be to implicitly encourage perjury. For these reasons, I respectfully dissent from the majority opinion.
HAWKINS, C.J., joins this opinion.
NOTES
[1] Both deeds of trust in question contained what is commonly referred to in Mississippi as a "dragnet clause," stating basically that the instruments secured not only the principal scheduled debt, but also any other indebtedness owed by either or both parties to the Bank. At the time the deeds of trust were taken, P.O. was indebted separately to the Bank on several obligations relating apparently to his real estate investments. These obligations were not incorporated into the $46,000.00 note and they were not ever paid in full. They were the subject of an extended succession of renewal notes carrying through until approximately February 1990, when the foreclosure of Lot 44 occurred.
[2] MCA § 89-5-21 reads in part: ... . if after request he [the mortgagee] fails or refuses to make such acknowledgment of satisfaction [of the underlying mortgage], the person so neglecting or refusing shall forfeit and pay to the party aggrieved any sum not exceeding the mortgage money, to be recovered by action... .